# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA <br>     ex rel. MARSHA MCCULLOUGH, <br> and STATE OF TENNESSEE <br>     ex rel. MARSHA MCCULLOUGH, <br><br>     Plaintiff-Relator, <br><br> v. <br><br> NASHVILLE PHARMACY SERVICES, LLC, <br><br>     Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. _____ <br> ) Jury Trial Demanded <br> ) FILED UNDER SEAL <br> ) <br> ) <br> ) |

## COMPLAINT

The United States and State of Tennessee, by and through Relator Marsha McCullough, bring this action under the False Claims Act and Tennessee Medicaid False Claims Act, and file this Complaint and allege as follows:

### JURISDICTION AND VENUE

1.    This action arises under the False Claims Act, as amended, 31 U.S.C. §§ 3729, *et seq.*, and the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181, *et seq.*

2.    This court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 31 U.S.C. § 3732(b), and 28 U.S.C. § 1345.

3.      This court has personal jurisdiction over Defendant pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a) in that Defendant does or transacts business in this jurisdiction and portions of the violations of the False Claims Act and the Tennessee Medicaid False Claims Act described herein were carried out in this district.

4.      Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c) and under 31 U.S.C. § 3732(a).

## THE PARTIES

5.      Defendant Nashville Pharmacy Services, LLC ("NPS") is a Tennessee corporation with its principal place of business at 719 Thompson Lane, Suite 57100, Nashville, Tennessee 37204.

6.      NPS was founded in 2000 by pharmacist Kevin Hartman as a pharmaceutical delivery service. In 2002, NPS began to specialize in HIV-related pharmaceuticals.

7.      Relator Marsha McCullough has worked for NPS as an Order Entry Technician from May 9, 2011 to July 27, 2012. Her job was to enter prescriptions into the pharmacy's data systems.

## FEDERALLY FUNDED HEALTH PROGRAMS

8.      Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.*, establishes the Health Insurance for the Aged and Disabled Program, popularly known as

- 2 -

the Medicare program. The Secretary of Health and Human Services administers the Medicare Program through the Centers for Medicare and Medicaid Services ("CMS").

9.     The Medicare program is comprised of two parts. Medicare Part A provides basic insurance for the costs of hospitalization and post-hospitalization care. 42 U.S.C. § 1395c-1395i-2 (1992). Medicare Part B is a federally subsidized, voluntary insurance program that covers the fee schedule amount for laboratory services. 42 U.S.C. §§ 1395(k), 1395(i), 1395(s).

10.     Reimbursement for Medicare claims is made by the United States through CMS. CMS, in turn, contracts with private insurance carriers to administer and pay Medicare Part B claims from the Medicare Trust Fund. 42 U.S.C. § 1395u. In this capacity, the carriers act on behalf of CMS. 42 C.F.R. § 421.5(b).

11.     In order to receive Medicare funds, enrolled suppliers, including NPS, together with their authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the states.

12.     Among the rules and regulations which enrolled suppliers, including Defendants, agree to follow are to: (a) bill Medicare Carriers for only those covered services which are medically necessary; (b) not bill Medicare Carriers for

- 3 -

any services or items which were not performed or delivered in accordance with all applicable policies, nor submit false or inaccurate information relating to provider costs or services; (c) not engage in any act or omission that constitutes or results in over-utilization of services; (d) be fully licensed and/or certified under the applicable state and federal laws to perform the services provided to recipients; (e) comply with state and federal statutes, policies and regulations applicable to the Medicare Program; and (f) not engage in any illegal activities related to the furnishing of services to recipients.

13.    Title XVIII of the Social Security Act, 42 U.S.C. §§ 1396, *et seq.* establishes Medicaid, a federally assisted grant program for the States. Medicaid enables the States to provide medical assistance and related services to needy individuals. CMS administers Medicaid on the federal level. Within broad federal rules, however, each state decides who is eligible for Medicaid, the services covered, payment levels for services and administrative and operational procedures. TennCare is the name of the State of Tennessee's Medicaid program.

14.    The Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), now known as TRICARE Management Activity, is a federally-funded program that provides medical benefits, including hospital services to (a) the spouses and unmarried children of (1) active duty and retired service members, and (2) reservists who were ordered to active duty for thirty days or

- 4 -

longer (b) the unmarried spouses and children of deceased service members; and (c) retirees. 10 U.S.C. §§ 1071-1104; 32 C.F.R. § 199.4(a).

15.    Resource-Based Relative Value Scale (RBRVS) has been used since the Omnibus Budget Reconciliation Act of 1989 to determine how much money medical providers should be paid. It is currently used by CMS and by nearly all Health Maintenance Organizations (HMOs). The RBRVS assigns procedures performed by a physician or other medical provider relative value units ("RVUs"). Total RVUs for a given procedure/CPT code is composed of three separate factors: physician work (52%), practice expense (44%), and malpractice expense (4%). The RVUs assigned to CPT codes change from year to year.

16.    RVUs are then adjusted by geographic region. This value is then multiplied by a fixed conversion factor, which changes annually, to determine the amount of payment.

17.    At all times relevant to this Complaint, the United States provided funds to the States through the Medicaid program pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et. seq.* Enrolled providers of medical services to Medicaid recipients are eligible for payment for covered medical services under the provisions of Title XIX of the 1965 Amendments to the Federal Social Security Act. By becoming a participating provider in Medicaid, enrolled providers agree to abide by the rules, regulations, policies and procedures governing claims for

- 5 -

payment, and to keep and allow access to records and information as required by Medicaid. In order to receive Medicaid funds, enrolled providers, together with authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the State.

18.     At all times relevant to this Complaint, the Medicare, Medicaid, TRICARE, CHAMPUS, and TennCare programs (collectively, "Government Health Programs") constituted a significant source of gross patient revenue for NPS.

19.     Tennessee Rules and Regulations chapter 1140 sets forth the standards that all pharmacies in the state of Tennessee must follow. Violating any of these rules may be considered "dishonorable, immoral, unethical, or unprofessional" and can carry a civil penalty of up to $1,000. Tenn. Comp. R. & Regs. 1140-8-.01 and 1140-01-.02.

20.     42 C.F.R. §§ 455, *et seq.*, expressly states that a provider must certify that he is in compliance with all federal and state statutes and regulations in order to receive payment from Government Health Programs.

## FACTUAL ALLEGATIONS

### *Co-Pay Cards and Waivers*

21.     A "copayment" is the portion of the cost of an item or service which the Government Health Program beneficiary must pay. Currently, for example,

- 6 -

Medicare generally pays 80% of the reasonable charge for an item or service, and the copayment is the remaining 20% of the reasonable charge. 42 U.S.C. § 1395l(a)(1).

22.     Pharmaceutical companies distribute "Co-pay Cards" to NPS to cover a percentage of the cost of its patients' copayments to private insurance companies.

23.     NPS routinely "writes off" copayment requirements or waives copayment requirements for Government Health Program patients by using the Co-pay Cards.

24.     For example, Relator is aware that NPS technician Doug Norman processed several of these Co-pay Cards to waive copayments for Medicare and TennCare patients.

25.     In fall of 2011, Melissa House advised Relator that these copayment waivers were rarely audited, and so to use the Co-pay Cards with Medicare patients.

26.     Similarly, NPS will often waive copayments for Medicare and TennCare patients in order to attract or retain their business.

27.     For example, Patient HW, who had received the name brand rather than generic version of Enoxaparin, had had his copayment waived for that prescription.

- 7 -

28.    Patient JHS, Prescription Number 454517 had her copayment waived. Her prescription was billed to Medicare on June 12, 2012, and was paid by Medicare in the amount of $1,194.06.

29.    Patients who do not have copayments waived outright are told that the copayment will be posted to their account balance, but the copayment is never actually posted and is instead written off.

30.    Sheridan Kaatz, accountant for NPS, acting under instructions from NPS owner Kevin Hartman and Sales Manager Melissa House, would write off copayments for Government Health Program patients.

31.    Kaatz told Relator that writing off copayments for Medicare and TennCare patients upset him because they were already being taken care of by the Government.

32.    In December 2011, Kaatz asked Relator to call approximately ten patients who had received copayment assistance but who had accidentally had their prescriptions filled twice that month to see if they had a stockpile so that NPS could bill the insurance for the following month without sending another prescription refill.

33.    It is illegal pursuant to the Medicare and Medicaid Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), to offer, pay, solicit, or receive anything of value as an inducement to generate business payable by Government Health Programs.

- 8 -

34.    By unlawfully applying Co-pay Cards to the copayment of patients insured by Government Health Programs, or by writing the copayments off, NPS is "waiving" their co-payment and unlawfully inducing those patients to purchase items or services from NPS, in violation of the Anti-Kickback Statute.

35.    Moreover, by writing off copayments or accepting Co-pay Cards in lieu of Government Health Program copayments, NPS is misstating its actual charges.

36.    Actual charges are used in calculating the "reasonable charge" by which reimbursement is determined by the Government Health Programs. Thus as a result of NPS's misrepresentation, it is receiving higher payments from those programs than to which it is entitled.

37.    Co-pay Cards are used by NPS with full knowledge that patients who are receiving Government Health Program assistance are not eligible to receive assistance from both the co-pay cards and Medicare.

38.    One example, the manufacturer of a drug called Valcyte offers NPS patients a Co-pay Card that pays up to 80% of the copayment for Valcyte prescriptions. The brochure included with the cards explicitly states that to be eligible to use the card, patients must "[n]ot participate in any federal or state funded healthcare program such as Medicare or Medicaid, Medigap, VA, DOD, or TriCare.

- 9 -

39.     Any and all claims submitted by NPS to Government Health Programs for prescriptions for which NPS waived the copayment are false.

## *Modifying Prescriptions*

40.     NPS instructs its Order Entry Technicians to take prescriptions for TennCare patients and extend them to the maximum 31 days.

41.     Relator was trained in May 2011 by Order Entry Technicians Cheryl Edenfield and Paul Dowell to change 29 or 30 day prescriptions to 31 days, and to write that the prescribing physician authorized the change (even though the physician was never contacted).

42.     When prescriptions are sent electronically, NPS prints them, scraps them, and rewrites them as 31-day prescriptions using a "phone-in" prescription pad.

43.     In May 2012, Relator was advised by Pharmacist Debbie Case that when NPS received the prescriptions electronically, to delete them and rewrite them as phone-in prescriptions. This allowed them to extend the prescriptions without alerting TennCare, because NPS's new software would send to TennCare the original prescription information and thus could not be altered without raising a red flag.

44.     Rewriting the length of prescriptions constitutes a violation of 42 U.S.C. § 1320c-5(a), which requires that services being billed to Federal Health Programs may be provided "only when, **and to the extent**, medically necessary."

- 10 -

45. Pharmacists and Technicians at NPS extend the length of these prescriptions without the authorization required by 21 U.S.C. § 353.

46. For example, on or about May 11, 2012, NPS extended Prescription Numbers 0478028, 0478030, and 0478031 from 30 capsules (to be taken once per day) to 31 capsules. This substitution was performed by Technician Regina French.

47. French falsely certified that the prescribing doctor, Dr. Beverly Byram, permitted the substitution by signing Dr. Byram's name to a new prescription, but Dr. Byram was never contacted and never gave permission for this substitution.

48. Similarly, when NPS cannot get a physician's approval to renew a prescription for a Medicare or TennCare patient, it will forge the signature of the physician.

49. For example, on May 22, 2012, NPS technician Doug Norman signed for Dr. Stephen Raffanti to renew Prescription Number 478546 for another year, without Dr. Raffanti's knowledge or permission.

50. Tenn. Comp. R. & Regs. § 1140-02-.01(2) states, in pertinent part, that pharmacists shall not "knowingly condone or assist in the dispensing . . . of drugs . . . which lack therapeutic value for the patient." Defendant's practice of maximizing the amount of drugs prescribed to a patient, beyond the amount

- 11 -

recommended by the patient's doctor, violates this rule and potentially endangers the patient.

51.    Furnishing items or services to patients (insured by Government Health Programs) substantially in excess of the needs of such patients is also a violation of 42 U.S.C. 1320a-7(b)(6)(B).

## _Automatic Prescription Refills_

52.    Tenn. Comp. R. & Regs. § 1140-03-.03 states, in pertinent part, that "a medical or prescription order shall not be refilled unless so authorized by the prescriber."

53.    NPS automatically refills patient prescriptions and durable medical equipment and ships them to the patients on the first day that the Government Health Program will pay for the refill.

54.    There is no review of the prescription, by doctor or patient, to determine whether the medication is still reasonable or necessary, as it is shipped automatically without request by the patient or the patient's medical provider.

55.    In fact, consumers often call and complain about receiving medications that they did not order (in part because the patients are still liable for the copayments).

- 12 -

56.     When patients called in to ask why they received medications that had not order, Relator was instructed by Cheryl Edenfield to tell them that it was to ensure that they never missed a dose of their HIV specialty medications.

57.     This auto-refill program often results in patients having multiple months' worth of unwanted prescriptions stockpiled.

58.     NPS bills on the first day the Government Health Program will allow, even if the pharmacy is actually closed on that day. NPS creates false fill logs and shipping/pickup logs for those refills.

59.     In May 2011, Dowell instructed Relator that it was NPS procedure to fill all prescriptions that had refills remaining.

60.     Relator was trained by Paul Dowell to keep a manual calendar with the prescriptions of all NPS's patients with HIV so that they could auto-refill them as soon as possible, whether they were asked to or not.

61.     Another technician told Relator to tell the consumers that they should stockpile these medications, whether they needed them or not, in case the consumers were ever dropped from the Government Health Program or were unable to get refills.

62.     One example of this automatic refill program costing the Government unnecessarily, from February through April 2012, Patient DG (Prescription Number 455431) was sent three orders of insulin syringes, 300 syringes total, for

- 13 -

which Medicare was billed, even though Patient DG did not have an active prescription for insulin.

63. On or about May 22, 2012, Relator realized that there was no reason to continue sending Patient DG insulin syringes and billing Medicare for them, and wrote in the NPS system that she was not going to fill this order and she considered it to be "fraud waste and abuse."

64. Because the system had "no expiration" as the date for the syringe order, NPS would have continued to send them every month had Relator not put a stop to it.

65. Any and all claims submitted by NPS to a Government Health Program for automatic subscription refills are false.

### *Partial Refills*

66. When NPS would run out of a medication needed to fill a prescription, it instead partially refilled the prescription but billed the Government Health Programs for a full refill.

67. Only after Relator alerted the Government to this fraud and informed owner Kevin Hartman of having done so, in June 2012, NPS changed its written regulatory policies so that technicians were instructed to bill only for the partial refill, and only bill for the full refill if the remainder is filled at a later date.

## *Random ICD9 Entry*

68.     When billing Medicare Part B, Order Entry Technicians are trained by NPS to repeatedly input random ICD9 codes until one is accepted by the system.

69.     This method guarantees that even though the technicians entering the billing information do not know the proper codes, the claims will ultimately be paid by Medicare.

70.     Any claim with an ICD9 code improperly and randomly applied is factually false.

71.     For example, when processing diabetic supplies under Medicare, Relator and the other technicians were told to keep inputting claims codes until they found one that would be accepted by the system to pay for the supplies.

72.     Sometimes the system would respond that six months of records of glucose testing frequency were required, but the technicians would override this without obtaining the necessary testing logs.

## *Fraudulent DUR Code Entry*

73.     The Medicare/Medicaid Drug Utilization Review "DUR" Program includes use of the Medicare or state's Medicaid agency's electronic monitoring system screens prescription drug claims to identify problems such as therapeutic duplication, drug-disease contraindications, incorrect dosage or duration of treatment, drug allergy and clinical misuse or abuse.

- 15 -

74.     Under the DUR program, certain drug transactions require review from a licensed pharmacist before the drugs can be dispensed. As a result, Government Health Programs will not allow a pharmacy to bill for those prescriptions without proper authorization from a pharmacist.

75.     In order to ensure that these potentially dangerous transactions are being reviewed by pharmacists, CMS assigns unique DUR override codes to pharmacists that are to be entered whenever the system indicates that a potential threat exists.

76.     NPS's Order Entry Technicians (who are not pharmacists), including Relator, were given DUR override codes to input for Government funded patients.

77.     The Order Entry Technicians were instructed to input these codes without pharmacist approval whenever a review was required in order to ensure that the Government pays for the refill, as if it were a mere administrative matter with no safety purpose.

78.     By entering the DUR codes, NPS was falsely certifying that a pharmacist, each of whom has his or her own unique DUR code, had reviewed and approved the transaction.

- 16 -

79. Each claim submitted by NPS to the Government Health Programs for an item that requires a DUR code, but which was entered by a technician with no prior pharmacist review and approval, is false.

80. Similarly, the final step of processing an order for medications is the Overall Drug Interaction ("ODI") check. The ODI check requires a pharmacist to review all of the medications that are on record for a patient and verify that there are no dangerous combinations.

81. Order Entry Technicians were instructed to bypass the ODI step and ignore any alerts which are generated by the system.

82. Twice within a short period of being hired, Relator received "Red Alerts" involving possible dangerous medication interactions. When she sought approval from the pharmacist on duty, she was told that she was to always input the DUR override codes and bypass the ODI check.

83. Two separate pharmacists informed Relator that pharmacy technician input of DUR override codes was the normal process at NPS. The pharmacists told Relator that the ODI check was unnecessary because most of the patients were aware of the possible drug interactions.

84. After Relator alerted the Government of this fraud, in June 2012, NPS changed its written regulatory procedures to instruct technicians to check with pharmacists when DUR codes were needed.

- 17 -

## *Recycling Medications*

85.     Medication is returned to NPS for a variety of reasons, including the death of the patient or a change in a patient's treatment regimen.

86.     NPS takes previously dispensed medication returned to NPS, which has already been billed to a Government Health Program, and reshelves it for future dispensing.

87.     When the medication is dispensed for a second time, a Government Health Program is again billed for the same, previously unused, medication.

88.     NPS is thus able to sell the same medication twice and only incur the cost of purchase once.

89.     NPS does not reimburse the Government Health Program for medications that were reimbursed that are returned by its patients.

90.     This resale of returned medications is contrary to NPS's written regulatory policies, which says that "Any medication that has left the control of NPS pharmacy staff or our contracted agents and is returned to the pharmacy is to be destroyed."

91.     Reselling returned medication to consumers also violates federal and Tennessee law.

92.     For example, Tennessee law requires that prescription drugs have a label with the manufacturer's name, control number, and expiration date. When drugs

- 18 -

were returned to NPS, it was common practice at NPS to mix the returned drugs with others and then re-sell them to patients. When mixing returned drugs with unsold drugs, the resulting assortment would be a hodgepodge of manufacturers, control numbers, and expiration dates.

93.    Similarly, this mixture of old and new drugs constitutes a violation of 21 U.S.C. § 331(b), which forbids the sale of misbranded drugs.

94.    In April 2012, Relator witnessed previously dispensed drugs (including Prescription Number 438347) being returned by the family of a deceased consumer, Patient EB, who was a Medicare patient. At least one of these drugs (Fosrenol) was recycled back into active inventory.

95.    Relator has witnessed NPS pharmacy technician James Reeves fill prescriptions using medication that had been returned to NPS after the original patient died.

96.    Relator witnessed James Reeves fill the prescription of Patient DW using the Fosrenol that had been returned from Patient EB.

97.    Any and all claims submitted by NPS to a Government Health Program for medications that had already had claims paid previously by a Government Health Program, e.g., for recycled medications, are false.

- 19 -

## *Concealment of Fraud from CMS*

98.    On March 12, 2012, Relator received a request for a "CVS Caremark CMS Medicare" audit in reference to a prescription that was filled in 2009.

99.    Relator contacted Mike Jessee, NPS's Long Term Care Patient Coordinator, and requested his assistance in completing the desktop audit request.

100.    When completed properly these desktop audits are used to identify instances where a fraudulent or incorrect prescription has been filled. Typically these desktop audits require the auditee to submit a copy of the original prescription as well as any other supporting documentation.

101.    In this event, Jessee simply re-printed the shipping label from the original prescription and attached a brand new prescription (from a 2012 prescription pad) with the same information that was being requested from the original prescription.

102.    Jessee then combined the reprinted shipping label, new prescription and delivery manifest and told Relator to submit that information to the desktop audit.

## *Retaliation*

103.    On May 11, 2012, NPS owner Kevin Hartman informed Relator that the following week she would receive a performance review and pay increase.

- 20 -

104.   On May 16, 2012, Relator emailed the OIG Medicare online complaint system, TennCare online complaint system, and Terry Grinder at the Tennessee Board of Pharmacy about her concerns with NPS's practices.

105.   On May 22, 2012, Relator informed Hartman that she had reported her concerns with NPS practices to the Government.

106.   On May 24, 2012, Relator sent a letter to Hartman that addressed numerous concerns with NPS's policies and practices, the same concerns she had shared with the Government, including: instructing technicians to enter the DUR numbers for the pharmacists without pharmacist review; auto-refilling prescriptions and encouraging patients to stockpile medications; representing itself as a general, rather than specialty, pharmacy in contracts with Government Health Programs and insurance companies; falsifying documents in response to CMS audits; dispensing expired medications, including as a result of recycling returned prescriptions; partially filling prescriptions; and filling prescriptions without first offering the patients counseling.

107.   Relator went on vacation from May 28, 2012 through May 31, 2012.

108.   When Relator returned from her vacation, she found that Hartman had made a number of personnel changes designed to distress Relator.

109.   Hartman had replaced James Stepp and his transplant delivery service (who Hartman and Relator had agreed was the best to use) with Tom Luckette

- 21 -

(who Hartman and Relator agreed had poor bedside manner and had had previous issues along those lines with some of Relator's transplant patients).

110.   As a direct result of this change in services and Luckette's poor bedside manner, at least one of Relator's transplant patients (her "VIP" transplant patient) transferred all of her medications to another pharmacy.

111.   Hartman also added the entire patient caseload of a recently fired technician, Jessica Lemke, to Relator's caseload, overloading her when she was already working with grant-funded medications, vaccination scheduling, inventory management, and transplant patients. This was after having been told by Hartman to focus her efforts on the transplant patients.

112.   Hartman had removed some of Relator's duties without telling her and reassigned them to other technicians.

113.   NPS never conducted Relator's performance review and she did not receive the promised pay increase.

114.   On June 8, 2012, Relator sent Hartman an email noting the timing of these changes in relation to her report to the Government and that they occurred while she was on vacation and unable to say or do anything about them. Relator wrote to Hartman that it appeared that these moves were all in retaliation for her having reported her concerns to the Government.

115.   On June 12, 2012, Hartman responded to Relator's letter with a letter of his own, addressing each of the issues she had raised and pleading either ignorance or innocence to all of them.

116.   On July 27, 2012, Relator was approached by Sales Manager Melissa House and instructed to sign a confidentiality form.

117.   Relator said that she wanted to have a lawyer review this document before signing, but was told that signing the document was a condition of her employment, and if she did not sign the form immediately, she would have her employment terminated.

118.   When Relator told House that she would not sign any documents without a lawyer reviewing them first, House told her that if she would not sign the document then her employment was terminated.

119.   After Relator again said she would not sign the documents without first having a lawyer review them, her employment was terminated and she was told to wait while they prepared a separation agreement.

120.   After Relator left without signing the agreement, pharmacist James Reeves called her voicemail and requested that she return her parking pass, name badge, and office key, which she did, and to return to sign the separation agreement, which she refused to do.

- 23 -

## Violations of 31 U.S.C. § 3729 – False Claims Act

121. Relator hereby incorporates and reallege herein all other paragraphs as if fully set forth herein.

122. As set forth above, NPS, by and through its agents, officers, and employees, knowingly presented, or caused to be presented to the United States Government numerous false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

123. As set forth above, NPS, by and through its agents, officers, and employees, knowingly made, used, or caused to be made or used, false records or statements material to numerous false claims, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

124. As set forth above, NPS, by and through its agents, officers, and employees, knowingly made, used, or caused to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

125. Due to NPS's conduct, the Government has suffered substantial monetary damages.

- 24 -

126.    The United States is entitled to treble damages based upon the amount of damage sustained by the United States as a result of the aforementioned violations of the False Claims Act, 31 U.S.C. §§ 3729-3733, an amount that will be proven at trial.

127.    The United States is entitled to a civil penalty of between $5,500 and $11,000 as required by 31 U.S.C. § 3729(a) for each of the fraudulent claims.

128.    Relator is also entitled to reasonable attorney's fees and costs, pursuant to 31 U.S.C. § 3730(d)(1).

## COUNT II

### Violations of Tenn. Code Ann. § 71-5-181 – TN Medicaid False Claims Act

129.    Relator hereby incorporates and reallege herein all other paragraphs as if fully set forth herein.

130.    As set forth above, NPS, by and through its agents, officers and employees, presented, or caused to be presented to the State of Tennessee numerous false or fraudulent claims for payment under the Medicaid program knowing such claims to be false or fraudulent, in violation of the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(A).

131.    As set forth above, NPS, by and through its agents, officers, and employees, knowingly made, used, or caused to be made or used, false records

- 25 -

or statements material to numerous false claims, in violation of the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(B).

132. As set forth above, NPS, by and through its agents, officers, and employees, knowingly made, used, or caused to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, in violation of the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(G).

133. Due to NPS's conduct, the State of Tennessee has suffered substantial monetary damages.

134. The State of Tennessee is entitled to treble damages based upon the amount of damage sustained by the State of Tennessee as a result of the aforementioned violations of the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181 through 71-5-185, an amount that will be proven at trial.

135. The State of Tennessee is entitled to a civil penalty of between $5,000 and $25,000 as required by Tenn. Code Ann. § 71-5-182(a)(1) for each of the fraudulent claims.

136. Relator is also entitled to reasonable attorney's fees and costs, pursuant to Tenn. Code Ann. § 71-5-183(d)(1).

- 26 -

## COUNT III

### Violation of 31 U.S.C. § 3730 – Retaliation

137.   Relator hereby incorporates and realleges herein all other paragraphs as if fully set forth herein.

138.   Defendant violated Relator's rights pursuant to 31 U.S.C. § 3730(h) by retaliating against Relator for lawful acts done by Relator in furtherance of efforts to stop one or more violations alleged in this action.

139.   As a result of Defendant's actions, Relator has suffered damages in an amount to be shown at trial.

## COUNT IV

### Violation of Tenn. Code Ann. § 71-5-183(g) – Retaliation

140.   Relator hereby incorporates and realleges herein all other paragraphs as if fully set forth herein.

141.   Defendant violated Relator's rights pursuant to Tenn. Code Ann. § 71-5-183(g) by retaliating against Relator for lawful acts done by Relator in furtherance of efforts to stop one or more violations alleged in this action.

142.   As a result of Defendant's actions, Relator has suffered damages in an amount to be shown at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Relator Marsha McCullough prays for judgment:

(a) awarding the United States treble damages sustained by it for each of the false claims;

(b) awarding the United States a civil penalty of $11,000 for each of the false claims;

(c) awarding the State of Tennessee treble damages sustained by it for each of the false claims;

(d) awarding the State of Tennessee a civil penalty of $11,000 for each of the false claims;

(e) awarding Relator 30% of the proceeds of this action and any alternate remedy or the settlement of any such claim;

(f) awarding Relator special damages resulting from the retaliation pursuant to 31 U.S.C. § 3730(h);

(g) awarding Relator special damages resulting from the retaliation pursuant to Tenn. Code Ann. § 71-5-183(g);

(h) awarding Relator her litigation costs and reasonable attorney's fees; and

(i) granting such other relief as the Court may deem just and proper.


Respectfully submitted,

Jason Marcus (*pro hac vice*)
Georgia Bar No. 949698

Julie Bracker (*pro hac vice*)
Georgia Bar No. 073803
Bothwell Bracker, P.C.
304 Macy Drive
Roswell, Georgia 30076
Ph: 770-643-1606
Fax: 770-643-1442

Chris Denison
The Law Offices of Christopher Denison
6030 Bethelview Road, Suite 304
Cumming, Georgia 30040
Ph: 678-367-8672
Fax: 404-351-8858

Attorneys for Relator